**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— x

**KEYA GALMAN,**

Plaintiff,

-against-

**NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK); TRANSPORTATION COMMUNICATIONS UNION/IAM; GREG KOCIALSKI, individually; KATRINA COLEMAN, individually; MATTHEW S. HOLLIS, individually,**

Defendants.

——————————————————————— x

Civil Action No.: ____________

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTION

Plaintiff Keya Galman was removed from service on October 10, 2023 and terminated effective November 8, 2023, following an allegation that she made threatening telephone calls between 6:10 PM and 6:35 PM on September 22, 2023. Amtrak did not remove Plaintiff from service, restrict her duties, or interview her during the eighteen days between the alleged incident and her removal. When Plaintiff was removed from service on October 10, 2023, she had not previously been informed of the specific allegation against her. The complainant did not testify

at the ensuing hearing. The Hearing Officer's written decision states that Plaintiff's phone records showed 'there were not calls from your phone number to Ms. Fairweather on the date and time in the charge letter,' and sustained the charge on the theory that Plaintiff 'could have used another phone,' while finding Plaintiff's GPS and parking records 'not directly relevant.' The sole hearing witness gave two written statements that are inconsistent with each other, with his hearing testimony, and with the Amtrak Police Department's own report. The video Amtrak submitted as corroboration ends before the charge window begins. Plaintiff personally identified each of these evidentiary problems and reported them to her union representatives. Although Jackson later addressed some of these problems during the internal appeal process, that evidence was not carried forward into the SBA 973 arbitration record.

Plaintiff brings this action asserting: (1) a hybrid claim under the Railway Labor Act against TCU/IAM for breach of the duty of fair representation, and against Amtrak and TCU/IAM for vacatur of SBA 973 Award No. 899; and (2) retaliation against TCU/IAM, Kocialski, Coleman, and Hollis under LMRDA Title I. Plaintiff seeks reinstatement, back pay, compensatory damages, and attorney's fees.

## SUMMARY OF KEY DEFECTS

This Complaint challenges a termination and arbitration award built on the following defects, each independently supported and detailed in the Factual Allegations and Claims for Relief below:

- No corroborating evidence tied Plaintiff to the calls charged. The Hearing Officer's own decision states Plaintiff's phone log showed no calls to the complainant; the Hearing Officer sustained the charge reasoning that Plaintiff could have used another phone. ¶¶ 57, 90.

- The union possessed, but did not develop or present, the evidence that would have undermined the only physical corroboration in the record. Coleman received notice of the video

timestamp discrepancy on February 9, 2024 — nearly two years before the arbitration — and never forwarded it to the representative preparing Plaintiff's case. ¶¶ 62, 65, 105.

- The arbitration award itself confirms this evidence was never presented, and that its own findings are directly undermined by evidence already in the record. ¶ 105.

- The arbitration process bore hallmarks of a fundamentally unfair proceeding: a Carrier Board Member who had previously directed the local discipline process, and an outcome distributed to select officials months before the formal award issued, with instructions to keep it confidential. ¶¶ 106, 78.

- The award's finding on Plaintiff's length of service is erroneous by more than five years, materially affecting the information before the Board when it assessed proportionality. ¶ 88.

- Plaintiff's protected activity — including her complaint about Coleman's conduct and her organizing of a 305-member petition — was followed by the displacement of the representative who had developed her strongest evidentiary challenges, and by conduct that would deter a reasonable union member from raising similar concerns. ¶¶ 74, 114.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal labor law, including a hybrid claim for breach of the duty of fair representation under the Railway Labor Act, 45 U.S.C. §§ 151 et seq., and a retaliation claim under the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411.

2. Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff was employed at Amtrak’s Moynihan Train Hall, Penn Station, New York, New York, all defendants

conduct business in this District, and the events giving rise to this action occurred substantially in this District.

3. This action is timely. Plaintiff's DFR theory is that Coleman, while representing Plaintiff throughout the arbitration proceeding culminating in SBA 973 Award No. 899, failed to ensure that exculpatory evidence in her possession reached the representative preparing Plaintiff's case, and that this failure was not remedied before the award issued. A hybrid DFR claim accrues when the plaintiff knew or reasonably should have known of the union's alleged breach. Where, as here, a union purports to fulfill its duty of fair representation by representing an employee throughout an arbitration hearing through to the arbitrator's issuance of an award, the requisite knowledge generally will not be inferred prior to issuance of the award. Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc., 742 F.3d 42, 47 (2d Cir. 2014); Ghartey v. St. John's Queens Hosp., 869 F.2d 160, 165-66 (2d Cir. 1989) (a hybrid suit filed before issuance of the award, where the union represented the employee throughout the arbitration, would be premature). Applying that standard to the facts alleged here, Plaintiff's claim accrued no earlier than April 16, 2026. SBA 973 Award No. 899 issued April 16, 2026, and this Complaint is filed within six months of that date. Even if the Court were to conclude that some part of Plaintiff's claim accrued earlier, the specific DFR theory pressed here — that Coleman's failure to transmit known exculpatory evidence left the arbitration record incomplete — could not have been fully asserted, and its resulting prejudice could not have been established, until the award confirmed that the evidence had in fact never reached the arbitrator. DelCostello v. Int'l Brotherhood of Teamsters, 462 U.S. 151 (1983). Moreover, at the time Coleman failed to forward the evidence in February 2024, Jackson nonetheless obtained and used the evidence in his February 15, 2024 rebuttal, as set forth in paragraphs 64-65, giving Plaintiff a reasonable basis to believe the matter had been addressed. Plaintiff subsequently learned, through Jackson's July 17, 2026 written statement, that Kocialski removed Jackson from oversight of the NEC that same month, stating that Coleman was better suited to work with Funk and other NEC

management; Plaintiff was not aware of this development or its significance at the time. It was not until Jackson's later removal from his TCU Board Member authority immediately before the January 6, 2026 hearing, followed by the April 16, 2026 award's own confirmation that the evidence had never reached the arbitrator, that Plaintiff could have known the deficiency had in fact persisted. The conduct described in paragraphs 62-65 predates the award and is pled as part of the factual basis for that theory, not as a separately accrued claim.

4. Exhaustion of internal union remedies is excused. The TCU Executive Council lacks authority to order Amtrak to reinstate Plaintiff or to award back pay, Clayton v. Int'l Union, UAW, 451 U.S. 679 (1981). The Executive Council is composed in relevant part of the individual defendants named in this action. As set forth below, Hollis's stated basis for denying Plaintiff's related Lodge 718 election complaints shifted between successive written responses, and a petition documenting a pattern of conduct by Coleman has remained pending before Hollis, Wilhelm, and Kocialski since March 8, 2026 without a substantive response, which supports a finding that further internal appeal would be futile. Exhaustion is further excused because internal union procedures cannot vacate SBA 973 Award No. 899 or reinstate Plaintiff to her Amtrak position, and pursuing an internal appeal through the very officers named as wrongdoers in this action would be futile. To the extent 29 U.S.C. § 411(a)(4) permits a labor organization to require exhaustion of reasonable hearing procedures not exceeding four months, Plaintiff alleges that any such requirement is satisfied, excused, or inapplicable, because the relevant internal procedures identified above have already been pursued, the officers who would hear any further appeal are themselves named as wrongdoers in this action, and further internal appeal would be futile for the reasons stated above.

## THE PARTIES

5. Plaintiff Keya Galman is a resident of the State of New Jersey. She was employed by Amtrak as Lead Bulletin and Assignment Clerk at Moynihan Train Hall from October 1, 2018

through her November 8, 2023 termination, with five years of continuous service and no prior discipline. She was Financial Secretary-Treasurer of TCU/IAM Local Lodge 718, a local board position, from January 2023 through May 2026, and separately served as Protective Committee Representative. She was removed from service on October 10, 2023 and terminated on November 8, 2023, and has been out of service since that date.

6. Defendant National Railroad Passenger Corporation ("Amtrak") is Plaintiff's former employer, headquartered at One Massachusetts Avenue NW, Washington, DC 20001.

7. Defendant Transportation Communications Union/IAM ("TCU/IAM") represented Plaintiff at all relevant times, headquartered at 3 Research Place, Rockville, Maryland 20850.

8. Defendant Gregory Kocialski served as TCU National Vice President and, after January 1, 2024, National Secretary-Treasurer. He served as Employee Board Member in SBA 973 Case No. 899 and is sued individually under LMRDA Title I.

9. Defendant Katrina Coleman served as TCU Assistant National Representative under Jackson from 2016 through early 2024, and thereafter as National Vice President. She is sued individually under LMRDA Title I.

10. Defendant Matthew S. Hollis has served as TCU National President since December 2025 and is sued individually under LMRDA Title I. Plaintiff had no direct interaction with Hollis before he became President; Plaintiff's dealings with him are limited to the written correspondence described below.

## FACTUAL ALLEGATIONS

### A. Employment History

11. Plaintiff was employed by Amtrak from October 1, 2018 through her November 8, 2023 termination as Lead Bulletin and Assignment Clerk at Moynihan Train Hall, handling TCU job bids and the seniority roster for approximately 300 to 320 employees, with five years of continuous service and no prior discipline.

12. National Representative Charles Jackson was Plaintiff's designated representative with jurisdiction over her territory. Coleman served as Assistant National Representative reporting to Jackson from 2016 through February 2024, with no authority to make local agreements or conduct personal relationships with property managers that would impede member representation. Local Chairperson Mikol Berry was Plaintiff's local representative. Jackson's July 17, 2026 written statement, based on his personal knowledge as Coleman's direct supervisor since 2016, is cited throughout this Complaint to corroborate the facts within his personal knowledge, including his own conduct, his direct observations of Coleman's handling of Plaintiff's case, and communications he personally received. Facts concerning events at which Jackson was not present, including Plaintiff's October 10, 2023 removal and her direct conversations with Coleman, are supported by Plaintiff's own contemporaneous written communications, cited below.

13. In July 2023, Superintendent Richard Funk told Plaintiff that he would circumvent the CBA and deal only with Coleman. This statement predates Plaintiff's removal by approximately eleven weeks and is relevant to the sequence of events described below.

14. On July 14, 2023, Funk emailed Plaintiff directly regarding a change to a payroll clerk position, copying Coleman and Starver but not Berry or Jackson. Amtrak VP of Stations and OBS Robert Jordan was later copied on the chain. Jackson, upon learning of the email, asked Coleman directly why Berry had not been included; Coleman responded, 'Ask Richard, I didn't send the email.' Coleman had no authority independent of Jackson to approve or negotiate a

change to a job position, as set forth in paragraph 12. This exchange is consistent with Funk's statement to Plaintiff, described in paragraph 13, that he would deal only with Coleman.

**B. The September 22, 2023 Allegation and the Eighteen-Day Delay**

15. Fairweather alleged that on September 22, 2023, she received two calls from an unknown number; that a coworker advised her to find an Amtrak Police officer; and that while she was looking for an officer, she received a call from a number she attributed to Jermaine Muir, during which the caller stated, in substance, ‘I'm going to get you after work, bitch. I'm going to fuck you up, you definitely going to get it today.’ Fairweather stated she placed that call on speaker until she could report it to her manager. Station Agent Onique McFarlane is alleged to have answered one such call. Fairweather reported the matter to Amtrak police that evening.

16. Amtrak did not remove Plaintiff from service, restrict her duties, or interview her during the eighteen days between the alleged incident and her removal on October 10, 2023. Plaintiff continued performing her full duties, including her responsibilities for approximately 300 to 320 employees, during this period. The 1998 Mediation Agreement, Article VI, Section 1(a), permits withholding an employee from service only where retention “could be detrimental to himself, another person, or the corporation.” Plaintiff alleges that Amtrak’s decision to allow her to continue working without restriction for eighteen days is inconsistent with a contemporaneous belief that she posed such a risk.

17. Berry raised this delay at the hearing, arguing that if Plaintiff were truly a detriment to the company, ‘why would they wait’ eighteen days to remove her from service. SBA 986, Award No. 341 (Amtrak), illustrates the materiality of such timing: the Board there treated the Carrier's delay in removing an employee after an alleged workplace threat, and its rejection of exculpatory statements that did not support its case, as evidence inconsistent with a genuinely perceived threat. Plaintiff alleges that TCU/IAM's failure to develop and preserve Berry's timing objection contributed to the incomplete record presented to SBA 973.

18. During this eighteen-day period, Station Manager Mark Jordan told Plaintiff directly that Starver and Funk had assigned him to watch Plaintiff on camera because of a complaint, and that he had not seen her do anything wrong. Jordan repeated this same statement during a later three-way telephone call that included Jackson, who has personal knowledge of Jordan's statement independent of Plaintiff's own account.

19. Three items of documentary evidence placed Plaintiff in Trenton, New Jersey, approximately sixty miles from Moynihan Train Hall, during the entire 6:10 to 6:35 PM charge window: a carrier-verified call log showing calls at 6:10 PM, 6:20 PM, and 6:47 PM; a LoJack GPS report; and a Trenton Station parking record. Amtrak did not rebut any of these three items on the merits at the hearing.

**C. The October 10, 2023 Removal From Service**

20. On October 10, 2023, at Assistant Superintendent Starver's direction, Station Managers Mark Jordan and Andrew asked Plaintiff to provide a written statement without disclosing any specific allegation, asking only whether anything had occurred between Plaintiff and Fairweather. Plaintiff stated nothing had occurred and submitted a written statement to that effect.

21. On October 10, 2023, Jordan called Plaintiff to a conference room at Moynihan Train Hall. Jordan told Plaintiff he did not yet know the specific allegation and left to obtain details from Starver. Jordan returned, directed Plaintiff to gather her belongings, and confirmed she was being removed from service. Plaintiff requested her union representative. Jordan responded that management had been told the representative was already aware. In the presence of a second Station Manager, Andrew Green, Jordan told Plaintiff that the call had come from Jermaine Muir's phone. Plaintiff was not present for, and does not allege, any involvement by Jackson in these events; this account is based on Plaintiff's personal knowledge as the person to whom these statements were made. Article VI, Work Rules 1-Discipline, paragraph (a) of the

1998 Mediation Agreement guarantees a fair and impartial investigation; Plaintiff alleges that denying her request for union representation at the moment of her removal, on the stated basis that a representative was already aware, is inconsistent with that guarantee.

22. Plaintiff was escorted to Station Manager LaMarr Miller, who took her Amtrak badge and gave her written notice that she was being placed out of service pending investigation. Amtrak Police were present outside the room during this process. Plaintiff was escorted from Amtrak property. She received the written Notice of Investigation the following day, by FedEx.

23. The October 11, 2023 Notice of Investigation, issued by Lead Charging Officer Jennifer Haken-Lafty, stated: 'It is alleged that on Friday September 22, 2023, at between 6:10-6:35 PM, you displayed unprofessional conduct towards your fellow co-worker when you called her personal cell phone and made threats against her. This is a violation of Amtrak policies and The Code of Ethics and Standards for Behavior.' It did not reference the Workplace Violence Policy, Jermaine Muir, or a blocked telephone number — the theory Plaintiff had been given verbally the day before.

24. Coleman — an Assistant National Representative with no jurisdiction over New York members at that time — was the only union representative Amtrak notified of Plaintiff's removal. Neither Berry nor Jackson was notified through any official channel. Plaintiff encountered Berry by chance and informed him herself; Berry then contacted Jackson, who was likewise unaware. Jackson's statement confirms that Amtrak did not notify him of Plaintiff's removal and that he learned of it only when Berry contacted him.

25. Jackson's July 17, 2026 written statement, based on his personal knowledge, states that in the period between Plaintiff's October 10, 2023 removal and the November 2, 2023 hearing, he and Berry attempted to reach Coleman and could not, and that Coleman did not provide any documentation or information, or otherwise make herself available, to assist in preparing for the hearing, despite being the representative Amtrak had notified directly.

**D. The Theory Changes: From Jermaine's Phone to a Blocked Number**

26. The theory of the case changed between Plaintiff's October 10, 2023 removal and the November 2, 2023 hearing. At removal, Plaintiff was told the call came from Jermaine Muir's phone. Per the Declaration of Jermaine Muir, sometime between September 23, 2023 and October 11, 2023, Superintendent Randolph Starver called Jermaine in and asked him for a statement about "the incident" without specifying what incident, and during that conversation handed him a copy of Amtrak's Harassment Policy and told him he knew Jermaine "had nothing to do with it" because he had seen him on camera with Manager Miller; Jermaine did not provide a statement at that time. On or about October 11, 2023, Station Manager Mark Jordan separately asked Jermaine to write a statement without explaining its subject matter. Around the same time, Starver gave Jermaine a direct order to provide the statement he had previously requested; without being informed of the subject of the statement, Jermaine wrote: "I am not aware of any incidents." That statement was not submitted at the hearing. By the November 2 hearing, Amtrak's theory had changed to a blocked, untraceable number.

27. Per the Declaration of Jermaine Muir, on the evening of September 22, 2023, Jermaine was present with Station Manager Miller in the station management area at Moynihan Train Hall when Fairweather arrived and stated she was receiving calls from Jermaine's phone. Miller immediately asked Jermaine where his phone was; Jermaine removed it from his pocket and showed it to Miller. Jermaine attests his phone remained in his possession throughout that period and that Plaintiff did not possess his phone at any time during his shift. Jermaine further attests that he received a call from Plaintiff on his personal cell phone during the same evening — consistent with the 6:20 PM and 6:47 PM calls to Jermaine already reflected in Plaintiff's carrier-verified call log described in paragraph 19 — and that, to his knowledge, Plaintiff had already departed New York and was traveling back to New Jersey before the events with Miller occurred. Jermaine attests that beyond the single written statement described in paragraph 26, he was never asked by Amtrak, Amtrak Police, or TCU/IAM to address the possession or location

of his phone specifically, and was never interviewed by TCU/IAM or anyone acting on Plaintiff's behalf regarding whether Plaintiff had access to his phone, before or after the November 2, 2023 hearing. Jermaine's declaration addresses the specific alternate phone Amtrak initially identified: it establishes that phone was in Jermaine's own possession, at his own workplace, during the entire charge window, and that no one investigating on Plaintiff's behalf ever followed up with him about it. Amtrak identified no other specific alternate phone at any point in the proceeding.

28. The station management area where the events described in paragraph 27 occurred was Plaintiff's own former work area and is equipped with surveillance cameras. As set forth in paragraph 26, Starver himself stated that he had seen Jermaine on this camera footage and, on that basis, told Jermaine he knew Jermaine ‘had nothing to do with it.’ Notwithstanding Starver's own reliance on this footage, Amtrak never produced any video footage of this area or these events during the investigation, the appeal, or the arbitration proceeding.

29. Plaintiff was experiencing an active asthma condition during the relevant period. In Plaintiff's own contemporaneous written response to Brown's denial, she stated that on the day the calls were allegedly made, she “was sick with asthma issues and did not have a voice or proper breathing to threaten anyone” and “was barely able to speak,” and that records would show she “was in and out of work for about 2 weeks due to illness.” Directly after the September 22, 2023 incident, Amtrak had ample opportunity to remove Plaintiff from service but did not do so for weeks, until her October 10, 2023 removal. During this period, Starver visited her for a statement and asked if she was okay because, in Plaintiff's words, “I couldn't speak and my breathing compromised and I was coughing a lot.” Plaintiff called Starver on his personal cell phone to ask what was going on; Starver told her he could not discuss it with her. When Plaintiff responded that she could not write a statement without knowing what it concerned, Starver told her to write a statement saying just that. Plaintiff's work area was downstairs, separate from McFarlane's post in the upstairs Metropolitan Lounge, and their shifts overlapped only partially, with Plaintiff working approximately 8:00 AM to 4:30 PM and McFarlane working

approximately 1:00 PM to 9:30 PM; Plaintiff rarely visited the lounge and hardly ever encountered McFarlane. McFarlane's identification testimony rested on recognizing Plaintiff's “distinctive voice,” which Plaintiff alleges is inconsistent with her own contemporaneous account of her condition and her minimal contact with McFarlane during this period.

**E. McFarlane’s Contradictions**

30. Amtrak’s case rests on the identification testimony of a single witness, Onique McFarlane, who testified he had never previously spoken to Plaintiff by telephone (Tr. pp. 10-11). McFarlane’s account is inconsistent across five sources: his September 23, 2023 written statement; his October 3, 2023 supplemental statement; his November 2, 2023 hearing testimony; the Amtrak Police Department report; and the surveillance video.

31. McFarlane's September 23, 2023 statement states that Fairweather told him the caller was “Kehiea” [Keya] before he ever answered the phone, and that Fairweather then asked him to answer it; McFarlane's account attributes his identification of the caller to what Fairweather had already told him, not to his own recognition. McFarlane's October 3, 2023 statement, given ten days later, describes a fundamentally different sequence: that upon answering the phone himself, he heard “Keya on the phone,” and that he was the one who “asked who is it,” with the caller then identifying herself directly to him. These two accounts describe different sources for the identification — Fairweather's prior statement to him in the first account, and his own direct question to the caller in the second — rather than a mere difference in wording of the same exchange.

32. McFarlane and Fairweather described the calls as coming from a blocked, untraceable number. McFarlane testified the number was “possibly blocked” on some calls, though both of his written statements state the numbers were blocked on all calls. The Amtrak Police Department report attributed the September 22, 2023 call source to Jermaine Muir’s identified phone number. Fairweather initially told management and police the call came from

Jermaine's phone, consistent with what Plaintiff was told at her October 10, 2023 removal. The blocked-number account was not presented until the hearing.

33. McFarlane testified that 'the officer had told Ms. Fairweather whatever — whatever code to put in to unblock it and see the — see the number,' and that 'when the number was googled to see who it was, it was — it was untraceable to find out what name it was.' APD Report Case No. 23011074 does not reference an officer providing a code to unblock a number, does not reference any internet search conducted to identify a caller, and does not identify McFarlane as a witness, complainant, or interviewee anywhere in the report, notwithstanding McFarlane's testimony that he personally answered the call and identified the caller.

34. Both of McFarlane's written statements assert Fairweather did not answer the phone. The surveillance video shows her answering it. Plaintiff identified this discrepancy on February 9, 2024, as described in Section H below.

35. Fairweather was a Ticket Agent assigned to the Metropolitan Lounge, a customer-facing position, at the time of the alleged calls. The surveillance video and McFarlane's hearing testimony show Fairweather on her personal cell phone at the Metropolitan Lounge passenger check-in desk during the charge window. Amtrak's Code of Ethics and Standards for Behavior, admitted at the hearing as Exhibit I, states that 'personal electronic devices should not be used on the job unless authorized by a supervisor or manager.' Plaintiff alleges that any conduct capable of being observed by customers or the public, and therefore capable of bringing discredit to Amtrak within the meaning of the standard described in paragraph 58, was Fairweather's own use of her personal phone while stationed at a customer-facing counter, not Plaintiff's alleged private call placed from another state using her own personal phone.

36. McFarlane testified the caller stated, 'Oh, she scared now. Tell Terry I'm going to beat that ass after work,' and, when he asked 'Keya, what's going on?', that the caller responded, 'She's fucking other people's men.' Plaintiff alleges that this extended, articulate exchange is

inconsistent with her documented asthma condition, set forth in paragraph 29, under which she was barely able to speak.

37. Brown's January 11, 2024 appeal denial states that when McFarlane addressed the caller as 'Keya,' 'Claimant responded to her own name without objection' (Tr. p. 10). The transcript does not support this characterization. At Transcript page 10, McFarlane testified only that he asked 'Keya, what's going on?' and, based on the caller's unrelated response, concluded 'that that was Keya' — his own inference from a leading question, not a confirmation of identity by the caller. The only person shown identifying the caller by name at that point in the transcript is Fairweather, who stated 'It's Keya' after looking at the phone, not the caller herself. The caller at no point in the transcript confirms or responds to being addressed as Keya.

38. Brown's reliance on testimony and characterizations concerning police involvement, described above, is independently improper because it draws on the substance of APD Report Case No. 23011074, a document the Hearing Officer excluded from the hearing record, as set forth in paragraph 47. Neither Fairweather nor the investigating Amtrak Police officer testified at the hearing, and neither was made available to authenticate, explain, or be cross-examined regarding the report's contents. An appeal reviewing a Hearing Officer's decision is confined to the record developed at the hearing; a document excluded from that record, whose content no witness testified to or was available to explain, cannot properly form part of the basis for denying an appeal from it. Brown's denial does not disclose that the report was excluded, and does not explain how testimony concerning police involvement can support the denial without relying, directly or indirectly, on a document that was never part of the record Chaudhri decided the case on.

39. The video runs from approximately 6:04 PM to 6:07 PM. The charge letter alleges conduct between 6:10 PM and 6:35 PM. Fairweather is shown holding the phone for

approximately three seconds, a duration that does not match the extended exchange McFarlane describes in his written statements and hearing testimony.

40. McFarlane's testimony that Plaintiff's voice was immediately recognizable is inconsistent with his admission that he had never previously spoken to her by telephone, and with the asthma condition described in paragraph 29.

41. When Berry asked McFarlane on cross-examination whether it could have been anyone on the call, McFarlane responded, "why would Terry lie," and Hearing Officer designee Ho stated she would not credit hypothetical testimony. Berry did not complete this line of cross-examination. (Tr. p. 12.)

42. At Transcript page 13, immediately after McFarlane testified and was excused subject to recall, the Hearing Officer instructed him not to discuss his testimony or anything discussed in the room with anyone outside the room. Haken-Lafty, the Carrier's Charging Officer, then told McFarlane, 'I'll text you if you're needed to be called back,' and, 'if not, I'll also text you and let you know that you're good to go,' establishing a private texting channel between the Charging Officer building the Carrier's case and its principal identification witness immediately following the confidentiality instruction. Plaintiff further alleges, based on her own personal knowledge, that she overheard Haken-Lafty and McFarlane discussing texting with each other the night before the hearing.

**F. The Amtrak Police Department Report**

43. APD Report Case No. 23011074, generated October 19, 2023, contains six items relevant to this action: (1) the investigating officer recommended administrative closure, not termination, after Fairweather stopped cooperating on September 26, 2023; (2) the report attributes the call source to Jermaine Muir's identified phone number; (3) a written statement from Fairweather was attached to the report and has not been produced to Plaintiff; (4) the report

references prior incidents that individually predate the charge by more than 30 days, the period specified in Amtrak's charging rule; (5) Miller requested and received the report sixteen days before the hearing and testified without producing it; and (6) the report does not document Fairweather producing any call log, phone record, or other evidence corroborating that the calls occurred, is based on Fairweather's account as relayed to the investigating officer, and does not include a statement by any officer of having personally observed, verified, or obtained a call record.

44. The APD report's follow-up supplement, dated September 26, 2023, further states, per Fairweather's own account to the investigating officer, that Fairweather had previously dated Jermaine Muir, that Fairweather learned Plaintiff and Muir 'were still in a relationship and are cohabiting,' and that Fairweather attributed her allegations against Plaintiff to this personal history. None of this information was disclosed to Plaintiff, investigated, or referenced at any point in the November 2, 2023 hearing, Chaudhri's decision, the appeal, or the SBA 973 arbitration. Neither Amtrak nor TCU/IAM ever investigated whether Fairweather's undisclosed personal history with Muir, and her own stated attribution of her allegations to that history, bore on the truthfulness, motive, or reliability of the allegations against Plaintiff.

45. The APD report's second follow-up supplement, dated October 11, 2023 — the day after Plaintiff's removal — states that the investigating officer received written statements 'from all parties involved,' attached to an email from a Station Manager II. LaMarr Miller is separately listed in the report's 'Other Persons Involved' section. Notwithstanding that written statements existed from Fairweather and Jermaine Muir in addition to McFarlane, only McFarlane's statements were ever produced or presented at the November 2, 2023 hearing. Adjustment boards have recognized that the Carrier has an independent duty to produce material witnesses within its knowledge and control, NRAB, First Division, Award No. 21508, and that a fair and impartial investigation is denied where an essential witness possessing exonerating information does not testify, PLB 4228, Award No. 24.

46. Miller was a management official involved throughout Plaintiff's disciplinary process. Beyond taking Plaintiff's badge and providing the out-of-service notice described in paragraph 22, Miller supplied Carrier Exhibit E, the surveillance video, for use at the November 2, 2023 hearing, and separately sent Plaintiff the termination packet containing the full video with its visible timestamp. Miller was therefore the specific Carrier official who possessed, controlled, and transmitted the very evidence whose timestamp discrepancy Plaintiff later identified and brought to Coleman's attention, as set forth in paragraphs 62-65. Miller was also present, as set forth in paragraph 27, when Fairweather identified Jermaine Muir's telephone as the source of the calls and when Jermaine produced that telephone. The record identifies no substantive interview of Plaintiff or of Jermaine concerning that specific allegation before Plaintiff was removed and charged; the investigation instead developed only McFarlane's account before the charge issued.

47. The official Record of Exhibits for the November 2, 2023 hearing lists nine exhibits, A through I. APD Report Case No. 23011074 does not appear on this list. The Hearing Officer excluded the report from the hearing.

48. Brown’s January 11, 2024 appeal denial states that ‘Claimant’s calls were so terrifying to Ms. Fairweather that she sought out Amtrak Police Dept.’ (Tr. p. 8). This reference to Fairweather’s contact with Amtrak Police does not address the content of APD Report Case No. 23011074, does not address the report’s attribution of the call source, and does not acknowledge that the report itself was excluded from the hearing record described in paragraphs 43-47. Brown's citation to Transcript page 8 does not support this characterization. The hearing transcript's only reference to police at that location is McFarlane's testimony that he told Fairweather to give the phone to a police officer and that ‘she couldn't find a police officer’ — an uncertain, secondhand account containing multiple indiscernible portions, not testimony that Fairweather was terrified or that she sought out the Amtrak Police Department. Fairweather did

not testify at the hearing, as set forth in paragraph 51, and no witness with personal knowledge of her state of mind or conduct regarding police appeared at the hearing.

49. Haken-Lafty separately emailed the police report to Berry on the day of the hearing. The attachment did not transmit when Berry attempted to forward it to Plaintiff; Berry sent it to Plaintiff by text message instead. The report was circulated by Amtrak's own Lead Charging Officer outside the formal exhibit process, and was not entered into the hearing record it was later referenced against at the appeal stage.

**G. The November 2, 2023 Formal Investigation Hearing**

50. Haken-Lafty emailed hearing exhibits to Berry at 8:33 AM, 8:34 AM, and 9:04 AM on November 2, 2023; the hearing began at 9:07 AM. The video is not identifiable among these emails.

51. The Workplace Violence and Security Policy, not referenced in the October 11 charge, was introduced at the hearing over Berry's objection. (Tr. p. 15.) The official Record of Exhibits confirms the Workplace Violence Policy was admitted as Exhibit H. Fairweather did not appear or testify. Plaintiff and Berry called Jackson during a recess. (Tr. p. 22.) Jackson's July 17, 2026 written statement confirms he received this call while serving as Plaintiff's National Representative, corroborating Plaintiff's account of the recess and the conditions that prompted it. Article VI, Section 1(d) of the same 1998 Mediation Agreement requires that written notice of an investigation 'set forth specific charge(s)' against the employee in advance of the hearing. The October 11, 2023 Notice, described in paragraph 23, did not reference the Workplace Violence Policy; its introduction at the hearing was inconsistent with this requirement.

52. Two additional conduct-related policy documents were admitted as Exhibits G and I at the hearing, alongside the Workplace Violence Policy admitted as Exhibit H: Amtrak's Code

of Ethics and Standards for Behavior, a combined document stating that it merges ‘Amtrak's Standards of Excellence and Code of Ethics and Business Conduct,’ and a separate, older standalone Standards of Excellence document that the combined document states was merged into it. Neither the older standalone Standards of Excellence nor the newer combined Code was referenced in the October 11, 2023 Notice. Plaintiff alleges that introducing both an apparently superseded policy document and its own stated replacement as separate exhibits at the same hearing reflects the same imprecision regarding which specific rule Plaintiff was alleged to have violated that is described in paragraphs 23 and 50.

53. At Transcript pages 16-17, Miller's testimony confirmed that Workplace Violence was being treated as the charge against Plaintiff at the hearing. Berry asked Miller, ‘So Workplace Violence is what she's being charged with today, correct or incorrect?’ Miller answered, ‘Yes.’ Berry then stated, ‘But on the charge letter, it says “Unprofessional conduct.” It doesn't say anything about Workplace Violence on there at all,’ and asked Miller directly, ‘Is unprofessional conduct and Workplace Violence the same thing?’ Miller responded: ‘Workplace Violence is unprofessional conduct, but unprofessional conduct — unprofessional conduct encompasses many things, but Workplace Violence would be one of them.’ Berry identified Miller during this exchange as ‘the manager who prepared the case and handed it over,’ a characterization Miller did not dispute. Miller further testified that removal from service required a detriment ‘to the company, other — or other employees of the company — or anything to do with the operation,’ and that she personally did not decide to remove Plaintiff from service. Despite testifying at the hearing, Miller did not disclose or testify to her own presence during the September 22, 2023 interaction described in paragraph 27, in which Fairweather stated she was receiving calls from Jermaine's phone and Miller herself asked Jermaine where his phone was.

54. At Transcript page 7, the Hearing Officer asked, ‘Do I have this video?’ Haken-Lafty responded, ‘No, ma'am. I wasn't able to share it this morning.’ Berry asked to expand the video for examination; Haken-Lafty responded, ‘It's as big as it goes, I'm sorry.’ When the

Hearing Officer asked whether Haken-Lafty would send her the video, Haken-Lafty responded that access required Miller's permission, stating, 'You don't have permission to access the video, so I'll have to get Lamarr to give permission.' The Hearing Officer did not have independent access to the video during the hearing. A Board reviewing a similar denial of advance access to hearing exhibits found that the Hearing Officer's failure to afford the representative time to review the objected-to material, before referring the objection to a reviewing officer, left the union with no way to adequately respond and deprived the claimant of a fair and full investigation. First Division Award No. 30962 (2022). McFarlane testified that after receiving the call, he instructed Fairweather to give the phone to a police officer, that she could not find one, and that she reported the matter to a manager he identified as Selina. Her written decision nonetheless describes the video as corroborating McFarlane's testimony.

55. Amtrak's April 7, 1987 disciplinary procedures memorandum establishes three distinct roles in the investigation and discipline process. The Charging Officer prepares and presents the Carrier's case, including determining what evidence is necessary, interviewing witnesses, and collecting documents. The Hearing Officer is walled off from case preparation, assigned to the Law Department specifically "to separate the Hearing Officer from any personal interest in the hearing's outcome," and is required to "set forth findings of fact upon which his/her decision is based" for review by the employee and appellate officers. A third official, the senior department official, alone determines the discipline assessed following a guilt finding. Haken-Lafty's control over Plaintiff's access to Carrier Exhibit E during the hearing, described in paragraph 54, placed the Hearing Officer in a position of dependence on the Charging Officer for access to the Carrier's own evidence — the relationship this memorandum states the role separation exists to prevent.

56. The 1998 Mediation Agreement, Case No. A-12889, Article VI, Section 1(d), provides that where an employee has been withheld from service, the investigation shall be held within ten calendar days, extendable to a maximum of twenty days with one postponement.

Plaintiff was removed October 10, 2023; the hearing was held November 2, 2023, twenty-three days later. This provision was introduced as a union hearing exhibit with paragraph (d) highlighted. Amtrak's October 19, 2023 rescheduling letter, issued by Haken-Lafty as Charging Officer, moved the hearing from its original October 18, 2023 date to November 2, 2023 — one day after the original hearing date had already passed. Even accounting for this postponement, the November 2, 2023 hearing occurred twenty-three days after Plaintiff's October 10, 2023 removal, three days beyond the twenty-day maximum Article VI, Section 1(d) permits with one postponement.

57. Hearing Officer Chaudhri's November 8, 2023 decision states that Plaintiff's phone log records showed "there were not calls from your phone number to Ms. Fairweather on the date and time in the charge letter." The decision nonetheless sustains the charge, stating: "There was no evidence provided that the phone logs submitted were the only phone that could possibly have been used to call Ms. Fairweather that day." The decision states that Plaintiff's LoJack and parking records were "not directly relevant to the charges" because "the allegations were pertaining to your communications in the phone call." The decision confirms Plaintiff "denied ever calling Ms. Fairweather's phone or speaking to Mr. McFarlane on the date of the incident." The decision finds Plaintiff violated the Workplace Violence Prevention Policy, which was not referenced in the original charge letter. Plaintiff possessed one personal phone, for which she submitted call records into evidence, and one Amtrak-issued work phone, for which she did not have independent access to obtain records. Amtrak, not Plaintiff, controlled the work phone and its records and did not obtain or produce them. The Hearing Officer's finding that the phone logs submitted were not shown to be the only phone that could have been used does not account for the fact that Amtrak had the ability to obtain records for the one other phone in Plaintiff's possession and did not do so.

58. The charged conduct, as alleged, occurred while Plaintiff was off duty: Fairweather's own account places the threat as occurring 'after work,' and Plaintiff's personal

phone records, LoJack data, and parking records, described in paragraph 19, place her commuting home to New Jersey during the charge window, using her personal phone rather than any Amtrak-issued device. Adjustment boards addressing off-duty personal conduct have required the Carrier to establish a nexus between the conduct and the employment relationship before discipline may be sustained, and have set aside discipline where the Carrier failed to do so. See Third Division Award No. 43079 (Amtrak) (sustaining claim where Carrier failed to prove nexus between claimant's off-duty personal social media conduct and his employment); Public Law Board No. 7566, Award No. 229. Amtrak's own Workplace Violence Prevention Policy, P/I Number 7.56.1, states that its scope 'applies to employees, contractors and vendors with regards to conduct in the workplace including but not limited to onboard and Amtrak owned or managed property.' Plaintiff alleges that the Organization failed to develop or present the Policy's own scope limitation, or the off-duty nexus requirement, as a defense, notwithstanding that the charged conduct was, by its own terms, alleged to have occurred off duty and through a personal device. Separately, Amtrak's combined Code of Ethics and Standards for Behavior, admitted at the hearing as Exhibit I, as set forth in paragraph 52, states that 'unacceptable behavior includes off-duty conduct that brings discredit to Amtrak,' a standard not contained in the older, standalone Standards of Excellence also admitted at the hearing. Plaintiff alleges that the Organization failed to develop or present which version of the policy governed on September 22, 2023, or to require the Carrier to establish that the charged conduct actually brought discredit to Amtrak, a showing separate from the conduct itself that was never developed in the record. As set forth in paragraph 35, the only conduct in the record capable of being observed by customers or the public was Fairweather's own use of her personal phone at a customer-facing counter.

59. Exhibit E, the video, was the only item of physical evidence Amtrak offered as corroboration of McFarlane's testimony. No telecommunications record, forensic evidence, or other witness corroborated the identification. Absent Exhibit E, the charge rested solely on McFarlane's testimony, which was itself internally inconsistent for the reasons set forth in

paragraphs 30-41. Because the Hearing Officer's decision expressly relied on the video to corroborate McFarlane's account, the timestamp and content of Exhibit E were material to the outcome.

**H. Plaintiff's January 17, 2024 Written Response**

60. Brown's January 11, 2024 appeal denial states that Plaintiff's location evidence was irrelevant because "location of the employee was not at issue" and that Plaintiff was "capable of making threats via phone call towards an employee from any location."

61. On January 17, 2024, at 6:53 PM, Plaintiff sent Jackson a written response to Brown's denial. The response, prepared by Plaintiff, addressed: the absence of documentation supporting the phone call allegation; Jermaine Muir's phone as the originally identified source and his presence on camera at Moynihan during the charge window; the two McFarlane statements, compared side by side; Plaintiff's asthma condition and Starver's observation of her compromised breathing; and the absence of any statement or testimony from Fairweather in the investigation record. At 9:18 PM the same evening, Jackson forwarded Plaintiff's response to Coleman, writing: "Effective January 1, 2024, Katrina Coleman is handling the NEC and CNOC. I have forwarded your response regarding Robert Brown denial of the appeal." Berry was copied. Jackson's written statement and this contemporaneous email together establish that Coleman received, on January 17, 2024, the written record of the evidentiary issues addressed above, more than two years before the January 6, 2026 arbitration hearing.

**I. Discovery of the Video and Timestamp Evidence — The Causal Chain to the Arbitration Award**

62. On February 9, 2024, at 6:57 PM, Plaintiff emailed Coleman the Carrier Exhibit E video and identified a specific inconsistency between McFarlane's written statement and the video evidence: McFarlane stated that Fairweather did not answer the phone, while the video

showed Fairweather answering. Coleman responded two minutes later, “Ok.” At 7:26 PM, Plaintiff sent a second email identifying an additional material inconsistency: the video timestamp showed approximately 6:04 PM to 6:07 PM, while the charge alleged conduct between 6:10 PM and 6:35 PM. Plaintiff further explained that the three-second portion of the video could not corroborate the alleged extended telephone conversation described by McFarlane.

63. On February 10, 2024, Plaintiff separately notified Jackson that she had identified discrepancies between Exhibit E and McFarlane’s testimony, including the timestamp discrepancy and the fact that the complete video had not been played during the hearing. On February 14, 2024, Jackson requested that Plaintiff forward the video because, in his words, “She has not provided the video you sent to her,” referring to Coleman. This communication establishes that Coleman had possession of evidence identified by Plaintiff as material to the defense of the charge but had not transmitted it to the National Representative responsible for Plaintiff’s appeal.

64. On February 15, 2024, Jackson submitted a written rebuttal to Brown, addressed to the Hearing Officer's decision on internal appeal, stating that Carrier Exhibit E ends before the charge window and that McFarlane had never previously spoken to Plaintiff by telephone. This rebuttal was submitted within Amtrak's internal appeal process and predates by nearly two years the January 2026 SBA 973 arbitration submission described in paragraph 86; it is not the submission the award addresses in stating the Organization did not present the timestamp evidence.

65. The record set forth in paragraphs 62-64, corroborated by Plaintiff’s contemporaneous emails and Jackson’s independent written statement, shows that Coleman was notified in writing of the video timestamp discrepancy on February 9, 2024. Jackson’s February 14, 2024 email contemporaneously states that Coleman had not provided him the video Plaintiff

previously sent to her; Jackson obtained the video only because Plaintiff sent it to him directly that day. As set forth in paragraph 59, Exhibit E was the only item of physical evidence corroborating the sole witness against Plaintiff. Jackson's February 15, 2024 rebuttal was therefore prepared using evidence Plaintiff supplied directly, without Coleman having performed her representational function. Plaintiff alleges this same incomplete development persisted through the January 2026 arbitration record, described in paragraphs 86-87.

**J. Union Representation — The Waiver and Coleman's Relationship With Funk**

66. Jackson's July 17, 2026 written statement states, from his own personal knowledge as Coleman's supervisor, that Coleman signed Jackson's name to the post-hearing appeal without his authorization; that the appeal Coleman submitted did not include procedural objections and evidentiary arguments that Jackson later developed; and that Jackson rewrote the appeal and submitted it on November 29, 2023. By submitting an appeal that did not include these arguments, Coleman's conduct resulted in their absence from the carrier appeal record for the period before Jackson's intervention.

67. Jackson's statement further describes, from his personal knowledge, that Coleman held meetings with Funk and Starver about Plaintiff's case without including Berry, and did not raise the APD report at the December 13, 2023 HCO conference despite being present.

68. Jackson's statement, based on his personal knowledge as Coleman's supervisor since 2016, describes a documented pattern predating and extending beyond Plaintiff's case. In 2022, Jackson, Coleman, then-TCU President Maratea, and Hollis met in Philadelphia specifically because Jackson had raised concerns about Coleman's job performance on the SEPTA and Amtrak properties, after which the parties' respective duties were reinforced. Jackson states that he and Berry repeatedly raised concerns with Coleman about her making local discipline agreements with Funk and Starver, that he reported these concerns to Kocialski on

each occasion, and that Kocialski stated he would address them with Coleman but Jackson does not know whether he did.

69. After February 2024, Jackson and Coleman had repeated discussions regarding her failure to communicate and to timely respond to case deadlines on the SEPTA property, and her failure to maintain TCU's case file system; Jackson raised these concerns to NVP Nick Peluso and Kocialski, who did not act on them.

70. On March 18, 2024, Plaintiff sent Coleman a written rejection of Amtrak's waiver offer, stating: "I cannot accept this offer because the conversation I am alleged to have had never occurred … there is no statement nor testimony in the Discipline investigation record from any such person a phone call took place or a complaint from employee." Coleman responded, from her personal cell phone: "Ok. Thanks for responding."

71. In a subsequent telephone call between Plaintiff and Coleman, at which no other person was present, after Coleman had responded in writing to Plaintiff's questions about the waiver, Plaintiff told Coleman she would not sign because she had not made the calls. Coleman told Plaintiff that Funk did not want her to return. When Plaintiff noted she had never previously been disciplined, Coleman referenced an incident in which Plaintiff had been the victim of sexual harassment and threats by a coworker who was subsequently terminated — an incident not reflected in Plaintiff's personnel record, at which Coleman had been present — and described it as similar to Plaintiff's circumstances. Coleman told Plaintiff that declining the waiver could mean four to five years out of work. Plaintiff told Coleman she believed Coleman was advocating for Funk's position. Coleman responded that "everyone has an issue with her relationship with Richard" and that she was "not changing it for anyone." This account is based on Plaintiff's personal knowledge of a direct conversation with Coleman and is consistent with, and corroborated by, Coleman's contemporaneous written communications described in paragraphs 70 and 53. Plaintiff alleges that Coleman's statement reflects Coleman placing the

maintenance of her relationship with Amtrak management ahead of Plaintiff's interest in her representation.

72. On Sunday, March 24, 2024, Coleman emailed Brown, copying Funk, Berry, and Plaintiff: "Ms. Galman has notified the organization that she will not be accepting the RTW waiver. The organization will be requesting concurrence to take this case to arbitration." Funk replied two days later: "Thank you for the update." Coleman thereby communicated Plaintiff's confidential decision to reject the waiver to Funk, the Superintendent who signed Plaintiff's termination letter and whom Coleman had told Plaintiff did not want her to return.

73. Coleman and Kocialski did not support progressing the case to arbitration after Plaintiff rejected the waiver. Jackson signed the concurrence to arbitration as Board Member.

74. Plaintiff submitted a written complaint about Coleman's conduct on April 14, 2024. Within weeks, Kocialski removed Jackson from his oversight of the NEC. Jackson's statement, based on his personal knowledge, describes a conversation at Penn Station in February 2024 in which Kocialski told him that Coleman was suited to work with Funk and NEC management, and that Jackson would no longer oversee the NEC. Jackson did not receive a written reason for this change. Separately, and much closer in time to Plaintiff's own arbitration, Kocialski removed Jackson from his authority as a TCU Board Member for SBA and PLB arbitrations — the role that had permitted Jackson to write Ex Parte submissions and sign concurrences to move cases to arbitration — immediately before the January 6, 2026 hearing in Plaintiff's case. Jackson's statement, based on his personal knowledge, states that this authority had been specially granted to him in light of his approximately 98% rate of fully or partially sustained arbitration awards, that it was not standard for National Representatives generally to hold this dual role, and that neither Kocialski nor the TCU President provided advance notice of his removal from it or any reason for the removal, either at the time or since.

75. Plaintiff alleges that the following facts, taken together, rebut any explanation that Jackson's removal was coincidental or administrative: Plaintiff's complaint about Coleman was filed April 14, 2024; Kocialski supervised both Coleman and Jackson and made the removal decision; Jackson's removal followed within weeks of the complaint; Jackson's own written statement states that Kocialski, together with TCU National President Maratea and Vice President Hollis, made the decision that Jackson would no longer oversee the NEC because Coleman had a good relationship with Funk and other NEC management — a reason unrelated to case management or performance; Jackson was not replaced by a neutral substitute but by Coleman herself, the representative whose conduct was the subject of Plaintiff's complaint; and the brief Kocialski later submitted did not include the timestamp argument Jackson had developed in his February 15, 2024 rebuttal. Because Jackson was the representative who had developed Plaintiff's strongest evidentiary challenges, his removal deprived Plaintiff of that representative and placed her case in the hands of officials — Kocialski and Coleman — whose handling of her case was itself the subject of her complaint.

**K. Amtrak's Statements Regarding the Discipline Process**

76. Jackson's written statement describes, from his personal knowledge as an attendee, a meeting attended by Jackson, Kocialski, Coleman, and other TCU officers in which Amtrak VP of Labor Relations Andrea Gansen made statements that Jackson understood to mean that Amtrak directed local management what discipline to assess following investigation hearings. Jackson states TCU officers objected to Gansen's statements at the meeting. If accurate, Gansen's statement is inconsistent with the separation between case management and discipline determination that Amtrak's own April 7, 1987 memorandum, described in paragraph 55, establishes to prevent personal or institutional interest from influencing discipline outcomes.

**L. The Arbitration and the January 10, 2026 Email**

77. On January 6, 2026, Plaintiff's case was heard as SBA 973 Case No. 899 before Neutral Member Joan Parker. Kocialski served as Employee Board Member. Amtrak Labor Relations Director Aaron Buck served as Carrier Board Member. Jackson's statement, based on his personal knowledge, describes Buck as having previously held oversight of the Carrier Admin Charging Officer and the Hearing Officer assigned to Plaintiff's November 2, 2023 hearing, and as having directed that Hearing Officer not to rule on procedural arguments Berry raised. The day before the January 6, 2026 hearing, Kocialski and Jackson called Plaintiff, and Kocialski described her case as strong. Brahamij's case, No. 909, was heard the same day before the same neutral.

78. On January 10, 2026, four days after the hearing and approximately three months before the formal award, Kocialski emailed Jackson, Coleman, Franklin Canter, and Rick Cota, subject line "Results of Board 973." The email listed the disposition of sixteen cases, including Plaintiff's Case No. 899 as "Terminated" and Case No. 909, involving Brahamij, as "Return to work - LCA-No backpay," along with return-to-work dispositions for other claimants, including Teona Smart, C. Spivey, and Malone. The email stated: "The decisions will be written over the next month. I will let you know when I see them," and instructed the recipients: "Please don't make these public yet. It may take awhile to get awards."

79. Plaintiff's allegation does not rest on whether Kocialski knew the award would be final when he sent the January 10, 2026 email. Plaintiff alleges that three features of that email, taken together, create a reasonable inference of an appearance of prejudgment requiring scrutiny: first, Kocialski instructed recipients — including Coleman, whose conduct toward Plaintiff is separately at issue in this Complaint — not to make the listed outcomes public; second, that instruction and the underlying outcome information were shared with TCU officers but not with Plaintiff, the affected claimant, creating unequal access to information about her own case; and third, the formal award did not issue until approximately three months after the email represented that decisions would be written, without explanation for the delay. Jackson's July 17, 2026

written statement describes his own reaction to receiving the January 10, 2026 email and states, based on his experience with prior arbitration awards, his personal speculation about what role Kocialski and Buck may have played in the outcome; Plaintiff cites Jackson's statement solely as evidence of his own contemporaneous reaction and personal opinion, not as a factual admission by, or established finding regarding, Kocialski or Buck.

80. Plaintiff was contacted concerning her adverse SBA 973 outcome before Brahamij, Malone, Smart, and Spivey — coworkers of Plaintiff's in New York whose reinstatement Plaintiff has personal knowledge of — were contacted concerning their respective return-to-work dispositions. Plaintiff does not allege that the January 10 email itself constituted the legally final SBA 973 awards, nor does Plaintiff allege that the information concerning Brahamij establishes precisely when the Board reached its final decision. Rather, the January 10 email and the subsequent contact with the return-to-work claimants provide evidence that substantive SBA 973 dispositions were being communicated internally and, at least with respect to some claimants, were being implemented before the formal written awards were issued on April 16, 2026. Plaintiff alleges that these circumstances are relevant to the unequal access to information concerning the SBA 973 outcomes during the approximately three-month period between the January 6 hearing and issuance of the formal written awards.

81. Plaintiff is informed and believes that Defendant Coleman communicated information concerning Plaintiff's anticipated SBA 973 outcome to certain Lodge 718 members before the formal April 16, 2026 award was issued.

82. On April 30, 2026, Kocialski wrote to SBA 973 Case No. 910 claimant Chantell Malone that he had no insight into her outcome beyond the written award. Kocialski had, on January 10, 2026, emailed the case outcomes, including Malone's, before the formal awards issued. Coleman was copied on the April 30 email to Malone.

83. Kocialski's April 30, 2026 statement to Malone that he had ‘no insight’ into her outcome beyond the written award appears difficult to reconcile with Kocialski's own January 10, 2026 email, which specifically identified Plaintiff's case as ‘Terminated’ and Malone's case as ‘Return to work’ more than three months before either formal award issued. The January 10 communication also provides evidence that TCU officers possessed information concerning Plaintiff's anticipated arbitration outcome that was not provided to Plaintiff herself. This is particularly significant because Kocialski was the Employee Board Member responsible for participating in the SBA 973 process, while Coleman, who received the communication, was separately involved in Plaintiff's union representation and had previously failed to advance material evidence concerning Plaintiff's defense, as set forth in paragraphs 62-65. The distribution of the anticipated outcome within the Organization, coupled with the instruction that the information not be made public, provides further evidence concerning the degree of control and access to information exercised by TCU officials during the period in which Plaintiff's arbitration remained formally unresolved.

84. On April 16, 2026, Kocialski emailed Plaintiff the SBA 973 award directly. Plaintiff responded with specific questions concerning the January 6, 2026 executive session before Neutral Member Parker and Carrier Board Member Buck, including whether Kocialski had communicated the outcome to Coleman that same day. In his April 17, 2026 response, Kocialski did not deny communicating with Coleman; he described the executive session's general purpose and customary practices, and stated that communications between Board members and their ‘professional counterparts’ following such sessions ‘may include high level impressions’ and ‘may exist in the ordinary course.’ Plaintiff alleges that Kocialski's own description of customary post-hearing communications between Board members and their professional counterparts, provided in writing two weeks before his ‘no insight’ statement to Malone described in paragraphs 82-83, is relevant to whether such communications occurred with respect to Plaintiff's own case.

85. Jackson separately informed Plaintiff, based on his experience participating in SBA proceedings, that the Neutral's proposed disposition could be presented to the Board members for discussion and that the Board members could advocate for a different outcome before finalization. Plaintiff does not attribute that procedural explanation to Jackson's July 17, 2026 written statement; Plaintiff alleges it separately, based on her own recollection of her conversation with Jackson. The documentary record independently establishes that a substantive disposition of Plaintiff's case was communicated internally on January 10, 2026, before the formal award issued.

86. The formal award was not issued until April 16, 2026 — approximately three months after the Organization had already communicated Plaintiff's disposition as 'Terminated' — and, as set forth below, contained a material five-year error concerning Plaintiff's employment start date and did not address the timestamp discrepancy involving Carrier Exhibit E that Plaintiff had identified to Coleman before the hearing but that was never presented to the arbitrator, as set forth in paragraphs 62-65 and 95. Plaintiff alleges that these facts are relevant to the adequacy of the Organization's representation and to the integrity of the arbitration process because they demonstrate that the adverse disposition was communicated internally before the formal award, that TCU officials possessed and exchanged substantive information about the disposition while Plaintiff remained uninformed, and that the final award subsequently contained material omissions and a five-year factual error. Plaintiff further alleges that the circumstances warrant examination of whether the Organization meaningfully advocated for reconsideration, correction, or a different disposition after the January 6 proceedings and before the April 16 award became final.

**M. The SBA 973 Award**

87. The award denying Plaintiff's claim issued April 16, 2026, the day before Plaintiff's scheduled Lodge 718 FST reelection on April 17, 2026.

88. On April 21, 2026 — five days after the award issued and notwithstanding that the award had denied Plaintiff's grievance — Amtrak's Occupational Health Program Coordinator emailed Plaintiff, Robert Brown, and other Amtrak personnel stating that return-to-work testing, consisting of a drug screen and physical examination, had been ordered for Plaintiff, copying Funk among others. Amtrak advised that, upon receipt and review of the testing results and clearance by its department, Plaintiff and her department would receive notification approving her return to work. Plaintiff's examination was scheduled for April 27, 2026, and a reminder notice was sent the day before the appointment. Plaintiff appeared for the scheduled appointment; upon arrival, she was informed that the drug screening had been canceled. Plaintiff had received no prior written notice of the cancellation and was not provided an explanation for it.

89. The award's Background section states Plaintiff 'was hired by the Carrier on September 22, 2023' — a five-year error confirmed inaccurate by Amtrak's own hearing exhibit, a Standard of Excellence receipt bearing Plaintiff's actual hire date of October 1, 2018. This is the only reference to Plaintiff's tenure anywhere in the award. The award's entire discussion of proportionality consists of two sentences: 'In assessing the level of discipline the Board must determine whether the discipline was arbitrary, capricious, discriminatorily or excessively harsh in light of all the relevant circumstances. In assessing the level of discipline in this case, the Board finds that dismissal was warranted based on the nature and severity of the charge.' The award does not discuss Plaintiff's tenure, prior disciplinary history, or any comparable case in reaching that conclusion. Plaintiff alleges that the erroneous five-year reduction in Plaintiff's stated length of service materially affected the information before the Board when it assessed proportionality, notwithstanding the award's statement that 'all the relevant circumstances' must be considered.

90. The award's silence extends beyond proportionality. TCU's submission cited specific prior arbitration awards addressing the specific-charge requirement, the admissibility of

hearsay and denial of cross-examination, and the substantial-evidence standard, including Third Division Award No. 21419, SBA 973 Case No. 439, Public Law Board 7680, Award No. 179, Third Division Award No. 29009, and Third Division Award No. 31067, among others. The award does not discuss, cite, or distinguish any of these authorities, nor does it individually address the specific procedural violations TCU raised — the charge amendment, the hearing-timing violation, and the denial of cross-examination — disposing of all of them in a single sentence finding ‘no procedural defects.’ The award likewise contains no discussion of SBA 973 Case No. 909, involving Brahamij, even though that case was heard on the same date before the same Neutral, involved the same general Workplace Violence charge or category, and resulted in ‘Return to work - LCA-No backpay,’ while Plaintiff's Case No. 899 resulted in termination. Plaintiff does not allege that the Brahamij disposition legally required the same result in Plaintiff's case. Rather, Plaintiff alleges that the same-charge, same-docket comparator was materially relevant to the proportionality analysis that TCU itself placed before the Board and that the Organization failed to present that comparator to the Board. By contrast, in SBA 973 Case No. 910, decided by the same Neutral Member on the same date, the Board devoted multiple paragraphs to an individualized proportionality analysis, crediting the claimant's testimony regarding her state of mind, distinguishing a good-faith mistake from intentional misconduct, and modifying termination to a disciplinary suspension with reinstatement on that basis. Plaintiff alleges that the same Board and the same Neutral Member's application of a materially more searching analysis in a contemporaneous case, compared to the two-sentence treatment of proportionality in Plaintiff's own case despite her five years of service and clean disciplinary record, is relevant to whether the record before the Board was adequately developed and considered and to the adequacy of the Organization's representation.

**N. The Lodge 718 Election Sequence**

91. On November 30, 2025, Plaintiff formally protested the November 21, 2025 Lodge 718 nomination meeting to then-President Denise Brooks. Plaintiff's protest stated that Coleman,

who is not a member of Local Lodge 718, actively participated in and influenced the nominations, including by announcing Hamilton's candidacy before members could nominate, refusing to allow verification of Hamilton's dues delinquency while contesting only Plaintiff's own dues status, and telling Plaintiff at the meeting's conclusion that she ‘couldn't run’ based on a dues figure inconsistent with the distribution list the Lodge had been instructed to use. Plaintiff's protest asserted that Coleman, as a non-member with no role in Local Lodge 718, had no authority to influence eligibility determinations for either candidate, and that the member who nominated Hamilton was herself delinquent in dues under Article 4, Section 2 of the TCU/IAM Constitution and therefore not eligible to make a nomination. On January 22, 2026, Plaintiff emailed Wilhelm documenting these concerns and stating explicitly: ‘I am no longer requesting a new election.’ Wilhelm's reply that same day did not treat the email as a completed appeal, advising Plaintiff that her next step, if a protest remained pending more than thirty days, would be to appeal to Hollis directly. Plaintiff was subsequently deemed eligible by the Local Lodge President, on the basis that her dues balance discrepancy resulted from a check-off dues issue.

92. On February 17, 2026, Hollis ordered Lodge 718 to rerun its nominations and elections, citing ‘a number of formal protests received’ generally and identifying no appeal as the basis. On March 17, 2026, responding to a challenge that no appeal had been filed before the rerun order issued, Hollis for the first time asserted that Plaintiff had appealed to his office, stating that, ‘having brought these issues to my attention, I determined that these issues … required it to be rerun,’ while separately acknowledging in the same letter that Plaintiff ‘may have changed her mind after initially requesting a rerun election.’ The same March 17, 2026 letter addressed Jackson's complaint concerning Coleman's conduct during the nomination process, stating: ‘I have not found that Sister Coleman engaged in wrongdoing and I am confident she fully understands her responsibilities.’ In the same letter, Hollis stated he found it ‘troubling that a union officer would seek to encourage our members to leave TCU/IAM and become objectors.’ On March 18, 2026, Plaintiff wrote Hollis directly to correct the record,

noting that her January 22, 2026 email had been addressed to Wilhelm, not Hollis, that it explicitly stated she was no longer requesting a new election, and that Wilhelm's own reply had not treated it as an appeal.

93. Separately, a petition signed by approximately 305 TCU members, documenting a pattern of conduct by Coleman and reflecting membership-wide concern rather than an individual grievance, was submitted to Hollis, Wilhelm, and Kocialski on March 8, 2026, and remains active as of the filing of this Complaint. On May 7, 2026, three weeks after the SBA 973 award had already denied Plaintiff's grievance, Hollis wrote Jackson regarding a separate eligibility dispute involving a member identified in this Complaint as Hamilton, ruling that Hamilton remained eligible to run for office notwithstanding a dues discrepancy Hollis's own letter describes as resolved only after nominations had occurred, applying a standard inconsistent with the eligibility basis Hollis had articulated in his February 17 and March 17, 2026 letters. The same letter directed Lodge 718 to complete the rerun election within ten days and warned that any appeal of Hollis's ruling could not delay compliance with that instruction.

**O. Damages**

94. As a result of the conduct described above, Plaintiff has incurred the following: lost wages and back pay accruing since October 11, 2023; loss of employer-sponsored health insurance and other employment benefits; loss of potential Railroad Retirement service credit and related benefits; other economic losses proximately resulting from the loss of income and benefits, including housing and financial hardship, to be established with particularity in damages discovery; damage to her credit rating; and emotional distress. These losses began October 11, 2023 and continue as of the filing of this Complaint. Under a June 2, 2010 side letter agreement modifying the parties' Expungement of Discipline rule, dismissals and workplace violence violations are considered a permanent part of an employee's record that will not be

removed, underscoring the ongoing and continuing nature of the harm absent vacatur and reinstatement.

## CLAIMS FOR RELIEF

### COUNT I — Hybrid RLA Claim: Duty of Fair Representation and Vacatur of SBA 973 Award No. 899

(Duty of Fair Representation Against TCU/IAM; Vacatur Against Amtrak and TCU/IAM)

95. Plaintiff incorporates all prior paragraphs by reference.

**Legal Standard**

96. A union breaches the duty of fair representation when its conduct toward a represented employee is arbitrary, discriminatory, or in bad faith. Vaca v. Sipes, 386 U.S. 171 (1967); Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65 (1991). In a hybrid claim arising from arbitration, Plaintiff must establish that the union's breach caused or contributed to the adverse result. Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998); Sim v. New York Mailers' Union No. 6, 166 F.3d 465, 472-73 (2d Cir. 1999). Where a union's breach of its duty of fair representation seriously undermines the integrity of the arbitral process, that breach removes the finality otherwise accorded the resulting award and entitles the employee to relief against the union and, where appropriate, the employer. Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 567-72 (1976); DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151 (1983). Plaintiff's DFR claim is based principally on the Organization's failure to develop and present material evidence that Plaintiff specifically identified to the Organization before the SBA 973 proceeding, including evidence concerning the timestamp of Carrier Exhibit E, the discrepancy between that video and McFarlane's written account, and evidence concerning the allegedly implicated alternate telephone. Plaintiff does not allege mere negligence or an ordinary tactical decision by

Coleman; tactical errors and negligence alone do not give rise to a DFR breach. Vaughn v. Air Line Pilots Ass'n, Int'l, 604 F.3d 703, 709-10 (2d Cir. 2010). Rather, Plaintiff alleges the specific sequence set forth above: Coleman's written acknowledgment of the evidence, her failure to transmit it, Plaintiff's direct transmission to Jackson, and the award's own confirmation that the evidence was never presented to the Board. Plaintiff alleges that these omissions were arbitrary, discriminatory, or undertaken in bad faith, seriously undermined the integrity of the arbitral process that produced SBA 973 Award No. 899, and materially prejudiced her ability to obtain fair consideration of the grievance; on that basis, Plaintiff's hybrid DFR claim is the primary vehicle by which Plaintiff seeks vacatur of the award.

97. Separately, judicial review of an award issued under the Railway Labor Act is also governed by 45 U.S.C. § 153 First (q), which provides for limited review for failure of the Board to comply with the requirements of the Act, failure of the order to conform to or remain within the Board's jurisdiction, or fraud or corruption by a Board member. United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809-11 (2d Cir. 2009); Union Pac. R.R. Co. v. Sheehan, 439 U.S. 89, 91 (1978). Plaintiff does not ask this Court to reweigh the evidence presented to SBA 973 or substitute its judgment for that of the Board. Plaintiff instead challenges the adequacy of the representation that produced the arbitration record, the specific procedural circumstances alleged herein, and the resulting prejudice reflected in the Board's own written award. The DFR-taint theory of vacatur, the narrower statutory ground under § 153 First (q) addressed below, and the underlying DFR damages claim against TCU/IAM are analytically distinct, although the same underlying facts are relevant to each.

98. Plaintiff's relationship with Coleman had materially deteriorated before and during the handling of her disciplinary and arbitration matters. Coleman told Plaintiff directly that Funk did not want her to return, pressured her toward accepting the waiver by warning that declining could mean four to five years out of work, and stated she was ‘not changing’ her relationship with Funk ‘for anyone,’ as set forth in paragraph 71. Notwithstanding this conflict, Coleman

remained involved in and exercised authority over material aspects of Plaintiff's case. Plaintiff provided Coleman with the timestamp evidence undermining the Carrier's sole corroboration on February 9, 2024, as set forth in paragraphs 62-65; Coleman acknowledged receipt but did not ensure the evidence reached Jackson, who obtained it only because Plaintiff sent it to him directly. Plaintiff did not discover that this evidence had been omitted from the Organization's SBA 973 submission until the January 6, 2026 hearing itself. Plaintiff alleges that the Organization's failure to advocate for her was not an isolated omission but occurred in the context of her deteriorated relationship with Coleman: Coleman continued to participate in decisions affecting Plaintiff's representation, described in paragraphs 70-73, without taking reasonable steps to ensure Plaintiff's material evidence and arguments were fully presented. Plaintiff does not allege that a union violates its duty of fair representation merely because an employee loses an arbitration. Plaintiff alleges that Coleman's targeted treatment of her, combined with the resulting failure to preserve and present material evidence and the subsequent failure to address the material factual errors in the award described in paragraph 89, together constituted conduct that was arbitrary, discriminatory, or undertaken in bad faith, causing Plaintiff actual prejudice.

99. Plaintiff alleges that the following specific conduct was arbitrary, discriminatory, or in bad faith: Coleman's submission of an appeal, without Jackson's authorization, that omitted the procedural and evidentiary arguments Jackson later developed, as set forth in paragraph 66; Coleman's disclosure of Plaintiff's confidential decision to reject the waiver directly to Funk; and Coleman's statement that she would not change her relationship with Funk, which Plaintiff alleges reflects that Coleman placed the maintenance of that relationship ahead of Plaintiff's interest in her representation, as set forth in paragraph 71.

**Duty of Fair Representation**

100. TCU/IAM breached its duty of fair representation because Coleman possessed notice of evidence that directly undermined the only physical evidence relied upon by Amtrak to corroborate its sole identification witness, yet failed to ensure Jackson — the representative handling Plaintiff's appeal — received that evidence in a timely manner. As set forth in paragraphs 62-65, Coleman acknowledged receipt of the video on February 9, 2024, and Plaintiff's identification of its contradictions with McFarlane's statement, but Jackson did not receive it from Coleman and instead obtained it directly from Plaintiff on February 14, 2024. Plaintiff alleges this failure was arbitrary and prejudicial for the reasons set forth in paragraph 105.

101. The Organization's handling of Plaintiff's grievance is further placed in context by a contemporaneous workplace-violence matter involving Amtrak employee Antonio Smith and Red Cap Darryl Ghent. On April 3, 2026, Ghent reported to Amtrak managers Mark Wonderlin and Craig Simmons that a coworker had repeatedly made a demeaning comment toward him in front of passengers on an elevator, and that the same coworker later called him a derogatory name multiple times, followed him through a train, repeatedly bumped him, and removed his wallet from his pocket onto the platform. Passenger Barry Karas independently emailed the same two managers the same day, corroborating that Ghent had been twice subjected to the demeaning comment on the elevator in front of other passengers. When Ghent first reported the incident to Assistant Superintendent Randolph Starver, Starver characterized it as 'horseplay,' notwithstanding having reviewed surveillance footage of the incident. In an April 30, 2026 written complaint to Amtrak management, Labor Relations, Compliance, the Ethics Officer, OIG, and TCU National, Ghent stated that the incident had been witnessed by a passenger, documented through written statements, captured on Amtrak surveillance footage, and admitted to by the employee involved, and that the employee had been returned to active service at the same work location under a disciplinary agreement without notice to Ghent. Plaintiff does not possess the disciplinary agreement itself and does not characterize its precise terms; Plaintiff has

personal knowledge that Smith was permitted to return to employment subject to a one-year restriction from working as a Red Cap. On May 1, 2026, Amtrak Senior Director Labor Relations Aaron Buck responded to Ghent, stating that he could not comment on discipline involving another employee but confirming that Ghent's report had been received and 'taken very seriously,' and that Amtrak employee offenses are handled in accordance with governing policies and collective bargaining agreements. Ghent separately told Plaintiff directly that he reported the incident to Amtrak Police. The individual involved was subsequently arrested by Amtrak Police on May 3, 2026, on charges arising from the incident, after having already been returned to service.

102. Plaintiff's disciplinary treatment was materially different from Smith's. Plaintiff was not given a prior level or step of discipline and was taken directly to termination. Plaintiff was not offered a disciplinary agreement, return-to-service arrangement, or temporary assignment restriction as an alternative to termination. Plaintiff's case involved disputed allegations, no objective telecommunications evidence establishing Plaintiff as the caller, no testimony from the principal complainant at the disciplinary hearing, and testimony from the principal witness that the caller 'could be anyone,' as set forth in paragraphs 29-41. The Smith matter, as documented in the contemporaneous Ghent correspondence, involved alleged physical and threatening workplace conduct accompanied by an independent passenger witness, surveillance footage, written statements, and an admission by the employee involved, and nonetheless resulted in continued employment subject to a one-year restriction from the Red Cap assignment rather than termination. Plaintiff does not allege that Smith's discipline was legally required to be identical to Plaintiff's, or ask the Court to determine what discipline Smith should have received. Plaintiff alleges that the Organization, through Coleman, had access to a same-board comparator involving workplace conduct and should have considered whether that precedent was relevant to proportionality and presented it to the Board; the Organization's submission to SBA 973 did not present this comparison. Plaintiff alleges that the Organization's

failure to develop or present this comparator evidence during the SBA 973 proceeding was arbitrary or in bad faith, particularly in light of the award's characterization of Plaintiff's termination as ‘appropriate and proportionate,’ as set forth in paragraph 89.

103. The Smith matter is also relevant to Plaintiff's allegations concerning Coleman's representation. Plaintiff alleges, based on information presently known to her, that Coleman participated in arranging Smith's return to service together with management personnel including Starver, Funk, and Brown. Plaintiff does not allege that Coleman alone made the decision concerning Smith's discipline, or that Buck negotiated or was otherwise responsible for the specific terms of Smith's return to service; Plaintiff alleges only that Buck's May 1, 2026 response to Ghent establishes that senior Labor Relations personnel had contemporaneous knowledge of the underlying complaint. Plaintiff alleges that Coleman's involvement in the Smith matter gave Coleman personal knowledge of a disciplinary outcome, in a matter involving alleged physical workplace conduct, in which an employee was permitted to remain employed subject to a temporary restriction rather than terminated, and that this knowledge made proportionality and alternative disciplinary measures materially relevant to Coleman's representation of Plaintiff, described above.

104. The January 10, 2026 ‘Results of Board 973’ email provides contemporaneous documentary evidence of the materially different dispositions communicated for Plaintiff's Case No. 899 and Brahamij's Case No. 909. Kocialski identified Plaintiff's case as ‘Terminated’ and Brahamij's case as ‘Return to work - LCA-No backpay.’ As alleged above, Brahamij's case involved the same general Workplace Violence charge or category, was heard on the same date before the same Neutral, and arose within the same SBA 973 docket. Plaintiff further alleges, based on information communicated to her by Brahamij through Malone, that Brahamij's underlying conduct involved pushing a coworker in the chest and throwing his phone and was captured on Amtrak surveillance video, and that Amtrak Assistant Superintendent Starver and Lead Bulletin and Assignment Clerk Eric Brown told Brahamij, before the award issued, that she

would be returning to work. Plaintiff does not rely on Malone's account to establish the formal terms of Brahamij's award; the January 10 email establishes the return-to-work disposition. Plaintiff alleges that the documented difference is relevant because Plaintiff's case involved disputed conduct, no objective telecommunications evidence establishing Plaintiff as the caller, no testimony from the principal complainant, and evidence that the only physical exhibit offered as corroboration ended before the charged call window.

**Prejudice**

105. The Inconsistency Chart (Exhibit S) and the Legal Significance Table (Exhibit T) together support the causal chain required for Plaintiff's hybrid RLA/DFR claim. Exhibit S identifies contradictions across the five principal evidentiary sources — McFarlane's statements, his hearing testimony, the APD report, the Carrier's video, and the Award itself. Exhibit T applies those contradictions to the specific allegations set forth in this Complaint, showing: (1) DFR arbitrariness, in that Coleman possessed evidence undermining the Carrier's sole corroborating exhibit and did not ensure it reached the representative preparing Plaintiff's case, as set forth in paragraphs 62-65; and (2) prejudice and record incompleteness, in that the arbitrator never received the timestamp discrepancy, the Fairweather-answered-phone contradiction, the Declaration of Jermaine Muir, or the asthma-voice evidence, and the Award's own language confirms that the alternate-device theory and the video's corroborative weight went unchallenged as a direct result, as set forth below. These same contradictions inform, but are analytically distinct from, the separate fundamental-unfairness allegations concerning Buck's dual role and the January 10, 2026 email, addressed below.

106. Plaintiff was prejudiced because each item of omitted evidence directly undermined a specific finding the award relies upon. First, the award states the video ‘corroborates McFarlane’s testimony that Claimant placed the call to Fairweather’s phone’; the timestamp discrepancy Plaintiff identified on February 9, 2024, set forth in paragraph 62, shows the video

ends before the charged call window begins, directly undermining this finding. Second, the award states McFarlane's identification was based on 'his familiarity with Claimant through their working relationship'; Plaintiff's documented asthma condition, set forth in paragraph 29, directly undermines the voice-recognition basis for that finding. Third, the award states the Organization's location evidence 'does not foreclose the possibility that Claimant utilized an alternate device'; The Declaration of Jermaine Muir, set forth in paragraph 27, accounts for the one specific alternate device Amtrak had identified, establishes that no one investigating on Plaintiff's behalf ever interviewed Jermaine about it, and confirms no other device was ever identified by Amtrak at any stage. Fourth, the award states the Organization 'did not present evidence establishing that the video timestamp was inconsistent with the charged time frame'; paragraphs 62-65 establish that Coleman received this evidence on February 9, 2024, and never transmitted it to Jackson, who obtained it only because Plaintiff sent it to him directly. Had this evidence been developed and presented to the arbitrator, each of the four findings above would have been directly contested, and the sole basis for denying Plaintiff's grievance would have been materially weakened. An arbitration board reviewing this same Carrier's discipline has previously found that reliance on a witness's unavailable, conflicting hearsay account, without the corroborating evidence a claimant's representative failed to develop, cannot support a credibility finding sufficient to sustain discipline. Public Law Board No. 5808, Case No. 62 (Amtrak) (Aug. 15, 2000).

**Vacatur of the Award**

107. As set forth in paragraph 77, the same Carrier official — Buck — who had participated in directing the underlying disciplinary process against Plaintiff, including by directing the Hearing Officer assigned to Plaintiff's November 2, 2023 hearing not to rule on Berry's procedural objections, subsequently participated as the Carrier's Board Member in the appellate arbitration concerning that same discipline at the January 6, 2026 SBA 973 hearing. Adjustment boards have held that an investigating official with prior knowledge of a case, who is

thereby in a position to direct the investigation based on preconceptions, must instead conduct himself in a truly objective and aloof manner, just as would an outside judge, and that failure to do so is procedural error requiring reversal. First Division Award No. 21046.

108. As set forth in paragraph 78, Kocialski sent the January 10, 2026 email listing Plaintiff’s case outcome approximately three months before the formal award issued, instructing recipients not to make the listed outcomes public, and sharing that information with TCU officers but not with Plaintiff.

109. Plaintiff alleges that these circumstances, considered together with the incomplete evidentiary record described above, materially undermined the fairness and reliability of the arbitral process and contributed to the prejudice resulting from the Organization's breach of its duty of fair representation.

110. Amtrak's own conduct, independent of TCU/IAM's conduct, contributed to the fundamental unfairness of the arbitration record. As set forth in paragraph 51, Amtrak introduced the Workplace Violence and Security Policy at the hearing without prior notice, over Berry's objection, inconsistent with Article VI, Section 1(d)'s specific-charge requirement. As set forth in paragraph 21, Plaintiff's request for union representation at the moment of her removal was denied, inconsistent with the fair-and-impartial-investigation guarantee of Article VI, Work Rules 1-Discipline, paragraph (a). As set forth in paragraph 56, Plaintiff's hearing was held twenty-three days after her removal, exceeding the maximum period Article VI, Section 1(d) permits. As set forth in paragraph 54, Amtrak's own Charging Officer controlled Plaintiff's and the Hearing Officer's access to Carrier Exhibit E during the hearing. As set forth in paragraph 76, Amtrak VP of Labor Relations Andrea Gansen made statements Jackson understood to mean that Amtrak directed local management on discipline outcomes, inconsistent with the role separation described in paragraph 55. Each of these is independent Amtrak conduct that shaped the record

ultimately presented to the SBA 973 arbitrator, apart from and in addition to TCU/IAM's failure to develop exculpatory evidence within that record.

111. As set forth in paragraph 89, the award's misstatement of Plaintiff's hire date by more than five years deprived the Board of accurate information concerning Plaintiff's actual length of service when it assessed proportionality.

112. The award states that the Organization 'did not present evidence establishing that the video timestamp was inconsistent with the charged time frame,' and contains no discussion of the Brahamij comparison or the Workplace Violence charge amendment described in paragraph 51. Plaintiff does not allege that the arbitrator erred in weighing evidence that was presented; the award's own language confirms that the timestamp evidence Plaintiff had identified and provided to Coleman on February 9, 2024, as set forth in paragraphs 62-65, was not presented to the arbitrator. Plaintiff alleges that this confirms, in the arbitrator's own words, that the record placed before the arbitrator was incomplete as a direct result of TCU/IAM's failure to develop and present evidence in its possession well before the January 6, 2026 hearing, and that the award's reliance on the alternate-device theory, described in paragraph 57, is a direct consequence of that incomplete record.

113. Plaintiff separately seeks vacatur of SBA 973 Award No. 899 pursuant to 45 U.S.C. § 153 First (q). Plaintiff does not ask this Court to reweigh the evidence presented to the Board or to decide that the Board reached an incorrect result. Plaintiff does not allege that Buck's designation as Carrier Board Member was itself improper; the Railway Labor Act expressly contemplates carrier and employee panel members, as well as special adjustment boards established by agreement with a neutral member where the party members cannot agree, and a carrier-designated member aligned with the carrier's interests. Ollman v. Special Bd. of Adjustment No. 1063, 527 F.3d 239, 245-46 (2d Cir. 2008). Plaintiff pleads Buck's specific prior direct participation in the disciplinary process underlying this same termination — including

directing the Hearing Officer assigned to Plaintiff's November 2, 2023 hearing not to rule on Berry's procedural objections, as set forth in paragraph 77 — primarily as part of the overall circumstances bearing on the integrity of the arbitration process and the prejudice resulting from TCU/IAM's breach of its duty of fair representation, for purposes of Plaintiff's hybrid DFR-taint theory of vacatur described above. United Transp. Union v. Nat'l R.R. Passenger Corp., 588 F.3d 805, 809-11 (2d Cir. 2009). The five-year hire-date error, the omission of the timestamp evidence, Buck's dual role, and the other factual and evidentiary matters set forth above are pled as evidence of the prejudice resulting from TCU/IAM's breach of its duty of fair representation, and as evidence that the breach seriously undermined the integrity of the arbitral process for purposes of the hybrid DFR-taint theory, and not as independently sufficient grounds for vacatur under § 153 First (q) standing alone.

**COUNT II — LMRDA Title I Retaliation**

(Against TCU/IAM, Kocialski, Coleman, and Hollis)

114. Plaintiff incorporates all prior paragraphs by reference.

**Legal Standard**

115. 29 U.S.C. § 411(a)(2) guarantees union members the right to meet and assemble with other members and to express views, arguments, and opinions, subject to the union's reasonable rules. 29 U.S.C. § 412 provides a civil cause of action for infringement of Title I rights. A retaliation claim requires protected activity, an adverse action, and a causal connection between the two such that the action would deter a reasonable union member from exercising Title I rights.

**Application to the Facts**

116. Plaintiff's principal protected activity under 29 U.S.C. § 411(a)(2) was organizing and submitting, together with approximately 305 other TCU members, the March 8, 2026 petition concerning Coleman's conduct as a union official, described in paragraph 92. That activity concerned the governance of the Organization and the conduct of a union officer, and involved a large group of members rather than Plaintiff's individual grievance alone. Separately, Plaintiff engaged in protected activity by filing a written complaint about Coleman's conduct on April 14, 2024.

117. Plaintiff engaged in protected activity by filing her April 14, 2024 written complaint about Coleman's conduct. Kocialski, who supervised both Coleman and Jackson and controlled Jackson's assignment, knew of Plaintiff's complaint and removed Jackson from his NEC oversight within weeks of it, as set forth in paragraphs 74-75. Jackson was the representative who had developed Plaintiff's strongest evidentiary challenges; following his removal, Coleman — the subject of Plaintiff's complaint — assumed the relevant representational role, and Plaintiff's evidentiary position in the proceedings that followed deteriorated in the respects described in paragraphs 90, 93, and 99. Plaintiff alleges that this sequence — protected activity, followed within weeks by the removal of the representative who had developed her strongest evidence and the elevation of the representative her complaint concerned — would discourage Plaintiff and other members from raising similar complaints about union officials. As set forth in paragraph 78, Kocialski distributed Plaintiff's case outcome on January 10, 2026 with an instruction to keep it confidential.

118. As set forth in paragraph 80, Coleman received the January 10, 2026 outcome information, and Plaintiff alleges Coleman communicated that information to Lodge 718 members opposing Plaintiff's candidacy before the formal award issued, which issued the day before Plaintiff's scheduled reelection, as set forth in paragraph 86.

119. Plaintiff does not allege that Hollis took a discrete disciplinary or tangible adverse action against her within the meaning of § 609. Plaintiff alleges instead that Hollis's conduct interfered with her rights as an elected officer: Plaintiff was the elected Financial Secretary-Treasurer of Lodge 718, scheduled for reelection on April 17, 2026, as set forth in paragraph 87, and the removal of, or interference with, an elected official in retaliation for Title I activity is independently actionable under § 102, distinct from a union's discretion over appointed staff. Sheet Metal Workers' Int'l Ass'n v. Lynn, 488 U.S. 347, 354-56 (1989) (distinguishing Finnegan v. Leu, 456 U.S. 431 (1982) on this basis). Plaintiff's protest of the November 21, 2025 nomination meeting, described in paragraph 91, and her subsequent correspondence with Wilhelm and Hollis, are pled as the protected activity to which Hollis's conduct described below responded. Separately and in the alternative, Plaintiff alleges that Hollis's conduct would chill a reasonable union member's exercise of Title I rights under Section 411(a)(2). Hollis's stated justification for the Lodge 718 election rerun shifted between his February and March 2026 letters, attributing the rerun in March to an appeal Plaintiff did not file; he then publicly identified Plaintiff by name to Lodge officers without disclosing any documented investigation involving her specifically. Hollis's handling of the March 8, 2026 petition, described in paragraph 93, reflects the same pattern: his office declined to engage with the petition's independently verifiable named statements on the ground that good-standing could not be confirmed, and, in his March 17, 2026 letter to Jackson, Hollis stated he had ‘not found that Sister Coleman engaged in wrongdoing’ without describing any investigation of the specific conduct documented in the petition. Plaintiff alleges that this pattern — shifting justifications, public identification, and summarily clearing Coleman while declining to engage with documented complaints — would deter a reasonable union member from raising similar concerns.

120. Kocialski, Coleman, and Hollis are sued in their individual capacities because each is alleged to have acted under color of their official union authority in taking or participating in

the conduct described above. Individual officer liability under Title I is available where an officer's own conduct, taken under color of union office, infringes a member's Title I rights. Specifically: Kocialski removed Jackson from his NEC oversight within weeks of Plaintiff's protected activity and later distributed Plaintiff's case outcome in violation of his own confidentiality instruction, as set forth in paragraph 117; Coleman is alleged to have communicated Plaintiff's anticipated outcome to members opposing her candidacy before the formal award issued, as set forth in paragraph 118; and Hollis publicly identified Plaintiff by name with a shifting justification and declined to substantively engage with the March 8, 2026 petition while summarily clearing Coleman of wrongdoing, as set forth in paragraph 119. TCU/IAM, Kocialski, Coleman, and Hollis are jointly and severally liable for the retaliation described in this Count.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court enter judgment against Defendants, jointly and severally where applicable, as follows:

121. Vacatur of SBA 973 Award No. 899, or, in the alternative, remand to Special Board of Adjustment No. 973 for further proceedings consistent with the Court's order;

122. Reinstatement of Plaintiff to her position as Lead Bulletin and Assignment Clerk at Amtrak's Moynihan Train Hall, or an equivalent position, with her original seniority date of October 1, 2018 restored, including restoration of Railroad Retirement Act service credit to the extent available for the period out of service;

123. Back pay and other economic relief from October 11, 2023, the first day Plaintiff received no wages following her removal from service, through the date of reinstatement, including such allocation of liability between Amtrak and TCU/IAM as the Court determines appropriate under Bowen v. United States Postal Service, 459 U.S. 212 (1983), and its progeny;

124. Compensatory damages for the harms described in paragraph 94;

125. Attorney's fees and costs under 29 U.S.C. § 412 and applicable law;

126. Pre-judgment and post-judgment interest;

127. Expungement of the September 22, 2023 incident and termination from Plaintiff's personnel record;

128. Such other and further relief as this Court deems just and proper.

**EXHIBIT INDEX**

Exhibit A — Hearing Officer Dalia Chaudhri's November 8, 2023 Decision Letter, ODI Case No. 163.23NY

Exhibit B — October 11, 2023 Notice of Formal Investigation for Termination, issued by Jennifer Haken-Lafty

Exhibit C — Official Record of Exhibits, NMB/PLB Case No. 163.23NY, November 2, 2023 hearing (Exhibits A-I)

Exhibit D — Haken-Lafty exhibit email chain, November 2, 2023, 8:33 AM - 9:04 AM

Exhibit E — 1998 Mediation Agreement, Case No. A-12889, Article VI, Section 1

Exhibit F — Robert Brown's January 11, 2024 HCO Appeal Denial Letter

Exhibit G — Plaintiff's January 17, 2024 Written Response to Brown's Denial

Exhibit H — January 17, 2024 Email Chain — Jackson case transfer to Coleman

Exhibit I — January 10, 2026 Email — Kocialski, 'Results of Board 973'

Exhibit J — Written Statement of Charles Jackson, July 17, 2026

Exhibit K — April 30, 2026 Email — Kocialski to Malone

Exhibit L — February 15, 2024 TCU Rebuttal to Robert Brown, signed Charles J. Jackson

Exhibit M — March 18, 2024 Email Chain — Plaintiff's written waiver rejection and Coleman's response

Exhibit N — March 24-26, 2024 Email Chain — Coleman to Brown, copying Funk, re: Plaintiff's decision to proceed to arbitration

Exhibit O — November 2, 2023 Text Message Exchange — Plaintiff and Berry re: APD police report

Exhibit P — February 9-14, 2024 Email Chain — Plaintiff's discovery of the video and timestamp contradiction, and Coleman's failure to forward it

Exhibit Q — Declaration of Jermaine Muir Pursuant to 28 U.S.C. § 1746

Exhibit R — Amtrak Interoffice Memorandum, April 7, 1987, 'New Disciplinary Procedures'

Exhibit S — Inconsistency Chart — McFarlane's Statements, the APD Report, the Video, and the SBA 973 Award

Exhibit T — Legal Significance, Union Failure, Record Omission, and Arbitration Impact Analysis

Exhibit U — SBA 973 Case No. 899, Signed Arbitration Award, issued April 16, 2026

Exhibit V — Amtrak Police Department Report, Case No. 23011074 (Excluded from Hearing Record)

Exhibit W — February 17, 2026 Letter from Hollis Ordering the Lodge 718 Election Rerun

Exhibit X — March 17, 2026 Letter from Hollis Asserting Plaintiff Had Appealed to His Office

Exhibit Y — Plaintiff's March 18, 2026 Letter to Hollis Correcting the Record

Exhibit AA — Plaintiff's November 30, 2025 Protest to then-President Denise Brooks Regarding the November 21, 2025 Lodge 718 Nomination Meeting

Exhibit AB — March 8, 2026 Petition Regarding NVP Katrina Coleman's Conduct (305 Signatures)

Exhibit AC — Plaintiff's Correspondence Submitting the Petition to Hollis, Wilhelm, and Kocialski

Exhibit AD — Plaintiff's January 22, 2026 Email to Wilhelm Stating She Was No Longer Requesting a New Election

Exhibit AE — May 7, 2026 Letter from Hollis to Lodge President Phillip Jackson Regarding the Election Rerun and Hamilton's Eligibility

Exhibit AF — April 7–14, 2026 Petition Follow-Up Correspondence with Hollis

Exhibit AG — November 2, 2023 Hearing Transcript, NMB/PLB Case No. 163.23NY

Exhibit AH — Amtrak Workplace Violence Prevention Policy, P/I Number 7.56.1

Exhibit AI — Amtrak Code of Ethics and Standards for Behavior

Exhibit AJ — Amtrak Standards of Excellence (standalone, superseded)

Exhibit AK — April 16–17, 2026 Email Chain — Kocialski to Plaintiff Regarding the SBA 973 Executive Session

Exhibit AL — April 21–27, 2026 Return-to-Work Testing Notices and Scheduling Correspondence

Respectfully submitted,

/s/ Keya Galman

**Keya Galman**

Pro Se Plaintiff

69 Bruce Park Drive

Trenton,NJ 08618

kgalman76@gmail.com
609-496-8371

Dated: September 24, 2026

**NOTICE REGARDING SERVICE OF PROCESS**

Plaintiff will effect service of the Summons and Complaint upon each defendant in accordance with Rule 4 of the Federal Rules of Civil Procedure, including service by a person who is at least 18 years old and not a party to this action, at the addresses below. This section will be completed with proof of service upon each defendant following issuance of the summonses by the Clerk of Court.

National Railroad Passenger Corporation (Amtrak)
c/o General Counsel
One Massachusetts Avenue NW
Washington, DC 20001

Transportation Communications Union/IAM
c/o National President Matthew Hollis
3 Research Place
Rockville, MD 20850

Gregory Kocialski, individually
c/o TCU/IAM

3 Research Place

Rockville, MD 20850

Katrina Coleman, individually

c/o TCU/IAM

3 Research Place

Rockville, MD 20850

Matthew S. Hollis, individually

c/o TCU/IAM

3 Research Place

Rockville, MD 20850

/s/ Keya Galman

**Keya Galman**

Pro Se Plaintiff

Dated: September 24, 2026